**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KENNY D. EWING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No.   13-74-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Kenny Ewing is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.   For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. §  405(g).

## PROCEDURAL HISTORY

Kenny Ewing applied for benefits in August 2011 alleging disability due to post-traumatic stress disorder, a back injury, and a neck injury (Tr. 175).   After holding an evidentiary hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the application for benefits in a decision dated August 15, 2012 (Tr. 24–41).   Ewing's request for review was denied by the Appeals Council, and ALJ Janney's decision became the final agency decision (Tr. 1).   Ewing has exhausted his administrative remedies and has filed a

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 14).

timely complaint in this court seeking judicial review of the ALJ's adverse decision.

## ISSUES RAISED BY PLAINTIFF

In his brief (Doc. 23), Ewing raises the following issues:

1. The ALJ failed to properly accommodate Ewing's moderate social functioning limitations;

2. The ALJ failed to properly accommodate Ewing's limitations in concentration, persistence, and pace;

3. The ALJ failed to properly consider Ewing's headaches;

4. The ALJ failed to explain how the evidence supported the RFC assessment; and

5. The ALJ erred in assessing Ewing's credibility.

## APPLICABLE LEGAL STANDARDS

**A.     Disability Standard**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. § 423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

The Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649

F.3d 565, 569 (7th Cir. 2011).   If the ALJ determines that the claimant is disabled or not disabled  at any step of the five-step  inquiry, the  inquiry  ends  without proceeding to the next step.   20 C.F.R. § 404.1520(a)(4).

The first step considers whether the claimant is presently unemployed.   20 C.F.R. § 404.1520(a)(4)(i).   If the answer is "no," the claimant is not  disabled and the  inquiry is over; if the answer is "yes," the inquiry proceeds to the next step.   *Id.*   The second step evaluates whether the claimant has an impairment or combination of impairments that is severe, medically determinable, and meets the durational requirement.   20 C.F.R. § 404.1520(a)(4)(ii).   Again, if the answer is "no," the claimant is not disabled and the  inquiry is over; if the answer is "yes," the inquiry proceeds to the next step.   *Id.*   The third step analyzes whether the claimant's severe impairment(s) meet or equal one of the listed  impairments  acknowledged  to  be  conclusively  disabling.   20  C.F.R.  § 404.1520(a)(4)(iii).   If the answer is "yes," the claimant is automatically deemed disabled; if the answer is "no," the inquiry proceeds to the next step.   *Id.*

Before continuing to step four, the claimant's residual functional capacity ("RFC") is assessed.   20 C.F.R. § 404.1520(a)(4).   The fourth step assesses whether the claimant can perform past relevant work given his or her RFC.   20 C.F.R. § 404.1520(a)(4)(iv).   If the answer is "yes," the claimant is not  disabled and the  inquiry is over; if the answer is "no," the inquiry proceeds to the next step.   The fifth and final step assesses whether the claimant can  perform  other  work  given  his  or  her  RFC,  age,  education,  and  work experience.   20  C.F.R.  §  404.1520(a)(4)(v).   If  the  answer  is  "yes,"  the  claimant  is not  disabled and the claim is denied.   *Id.*   On the other hand, if the answer is "no," the claimant is deemed disabled.   *Id.*

**B.     Judicial Review**

The scope of judicial review of the Commissioner's decision is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405(g).   Thus, the Court must determine not whether Ewing was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence.")

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   In addition to supporting the decision with substantial evidence, the ALJ must also include an adequate discussion of the issues and "build an accurate and logical bridge" from the evidence to each conclusion.   *Berger v. Astrue*,  516 F.3d 539, 544 (7th Cir. 2008).

While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (listing cases).   "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks

adequate discussion of the issues, it will be remanded.")

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Ewing in his complaint.

### A.    Plaintiff's Background

Kenny Ewing was born in August 1982 and was 28 years old on the alleged onset date—July 18, 2011.   He is 5 feet, 10 inches tall and weighs approximately 145 pounds. He has a 12th grade education.   At the time of the evidentiary hearing in July 2012, Ewing was living with his fianceé and his two children, ages seven and one and a half.

Following his graduation from high school, Ewing served in the United States Army for seven years as an aircraft mechanic.   In April 2007, while deployed to Afghanistan, Ewing fell approximately 20 feet off the top of a military helicopter.   He suffered a traumatic brain injury and injured his back and neck in the fall.   Ewing claims that since the fall, he has had vertigo, tinnitus, headaches, memory loss, and constant pain in his neck and back.   Due to his injuries, he was medically retired from the Army in June 2009. Ewing also suffers from PTSD as a result of his combat experience.

### B.    Ewing's Disability Allegations & Agency Forms

Kenny Ewing submitted a number of forms to the Social Security Administration, including two Function Reports, a Work History Report, an amended Work History Report, and a list of Medications (Tr. 182–90, 192–99, 220–30, 259–67, 269).   Ewing also testified at an evidentiary hearing in front of ALJ Janney on July 31, 2012 (Tr. 47–85).   His friend, Ronica Laws, submitted two Third Party Function Reports (Tr. 201–08, 232–39).   At that

time, she had known Ewing for two years and spent about three hours a week with him. Ms. Laws largely corroborated Ewing's statements on his disability application.   The following is a summary of Ewing's allegations regarding his disability as presented on the agency forms and at the evidentiary hearing.

Following his discharge from the Army, Ewing had four different jobs within a 15-month span (*See* Tr. 129).   Beginning in April 2010, he worked for an aircraft parts manufacturer for six months (Tr. 129).   According to Ewing, one of the reasons he left that job was because he had difficulty getting along with his coworkers (Tr. 68, 129, 295).   He then worked at a sanitation company for two months; he claims that he was fired due to his inability to get along with coworkers (Tr. 129, 295).   Next, he worked at a trash removal company for six months; he left that job because he found another job at an oil company that had better pay, better hours, and better working conditions (Tr. 68, 129, 324).   He worked at the oil company for approximately two months before he stopped working altogether on July 18, 2011 due to his impairments (Tr. 129, 175).   He listed July 18, 2011 as the onset date of his disability (Tr. 175).

Regarding his back and neck pain, Ewing claims that he is in pain "all the time."   He described the pain as "burning and crushing," and stated that it is throughout his legs, hips, and lower back.   His pain gets worse if he sits or stands for too long.   Ewing has tried a number of treatments to relieve his pain, including hot baths, heat packs, pain medication, muscle relaxers, a TENS unit,[2] physical therapy, steroid injections, and nerve

---

[2] TENS stands for Transcutaneous Electrical Nerve Stimulation.   It is predominantly used for acute and chronic nerve related pain conditions.   The machine sends stimulating pulses across the skin and along the nerve strands.   The pulses held prevent pain signals from reaching the brain and also stimulate the production of endorphins, which are natural pain killers.   *TENS Units for Pain Relief and Treatment*, http://www.tensunits.com (last visited June 9, 2014).

blocks.   None of the treatments have provided any sustained relief.

Ewing said he experiences symptoms related to PTSD on a daily basis.   He thinks one of his primary symptoms is that "[he] get[s] aggravated pretty easy" (Tr. 59).   For example, he has problems getting along with others mainly because the pain makes him irritable and he has difficulty following and remembering conversations.   He gets frustrated at home with his fiancée and children which leads to arguments.   When there is an argument, he leaves and goes off by himself; most of the time he goes outside and paces around the yard or sits on the porch.   Despite his difficulty getting along with others, when asked how well he got along with authority figures, he initially responded "ok," and later responded "well" (Tr. 188, 226).   Ewing thinks another of his primary PTSD symptoms is "[he] forget[s] things that [he] shouldn't forget" (Tr. 59).   For example, he has forgotten to take his child to school between five and ten times.   His memory issues are also related to his traumatic brain injury.

Ewing's PTSD symptoms get worse when he is around crowds or groups of people. For example, he avoids going to stores because he gets frustrated very quickly by "all the people, everything around pretty much" (Tr. 65).   He becomes "more watchful, on guard" (Tr. 65).   Ewing also does not go to many family gatherings, except for major holidays like Thanksgiving and Christmas.   When he does go, he tries not to be around any of the people because the crowd and the noise are difficult for him to handle.   Ms. Laws indicated that, about once a month, Ewing goes to family gatherings or social groups, but he does not always take part, and sometimes he needs someone to accompany him.

Because of his impairments, Ewing is no longer able to lift, walk, or stand for long periods of time.   When asked how long he can be on his feet, Ewing stated that it "usually depends on the day" (Tr. 67).   He can only walk about 200 feet before needing to stop and

rest.   He can stand for 20 to 30 minutes before he has to sit down.   He can sit anywhere from 20 to 60 minutes before he starts hurting and has to stand up.   He cannot lift over 20 pounds.

He has difficulty sleeping and only sleeps two to three hours per night.   He's usually in so much pain that he cannot fall asleep.   After he has managed to fall asleep, he has nightmares that wake him.   The nightmares happen two or three times a month, sometimes more.

Ewing also has difficulty concentrating and can only stay focused for "only a couple minutes" (Tr. 225).   Ms. Laws agreed, stating that he can pay attention for only 15 to 30 minutes.   Ewing does not finish what he starts because he gets distracted and forgets what he is doing.   For example, there have been times where was driving to his mother's house, but forgot where he was going, and passed her house.   He's also driven past his own house.   Ms. Laws also indicated that Ewing has a hard time following conversations, and he jumps from topic to topic.

Ewing is still able to handle his own personal needs and grooming.   However, things like bathing, shaving, and getting dressed take him longer than they used to because of the pain.   On his initial application, he said he did not need reminders to take of personal needs and grooming, but later said he needs a verbal reminder to shave and cut his hair.   He also needs a verbal reminder to take his medication.   Since the time of his disability application, Ewing has taken various pain medications, depression medications, muscle relaxers, and sleeping pills.   He said some of his medications make him drowsy, dizzy, and unable to focus.

Ewing no longer does yard work; either a neighbor or his landlord takes care of it. His roommate used to help him with the housework and cooking, and now his fiancée does.

He will do chores, such as laundry or the dishes, about twice a week.   He needs a verbal reminder to do the chores.   He has a lot of difficulty doing laundry, specifically loading and unloading the machines.   He no longer vacuums or sweeps the floors because it is too hard for him.   He prepares meals a "few times a week," but only simple things such as sandwiches or frozen dinners.   He goes to the store "every now and then" with his fiancée even though it is difficult for him (Tr. 64).

He said that he spends most of his day resting.   The baby is typically with his fiancée's family during the day because she is very active and he cannot keep up with her. Sometimes he watches television, but he cannot sit through a whole movie because of the pain.   He no longer hunts because it's too difficult to walk through the woods, through creeks, climb over logs, etc.   He no longer works on cars.   He no longer lifts weights or works out.   Aside from going to the store on occasion or going to the doctor, there are no other places that he goes just to get out of the house.

## C.    Medical Records

Ewing received care at VA facilities in Marion, Illinois and Mount Vernon, Illinois following his discharge from the Army in 2009 until sometime around April 2010 (*See* Tr. 285–89).   There are no medical records from this time period.   In or around April 2010, Ewing relocated to northern Illinois and transferred his care to the VA facility in Hines, Illinois.   The earliest medical records in the transcript are from the Hines VA beginning in June 2010.   Therefore, any information regarding Ewing's impairments prior to June 2010 is gleaned from later medical records.

### 1.  Back and Neck Pain

Following his fall from the helicopter in April 2007, xrays and an MRI showed Ewing

had a compression fracture in his lower spine at L1 (Tr. 491).   Recent MRIs show the old fracture as well as degenerative disc disease signal changes at L1-L2 (Tr. 318–20).   Recent MRIs of his cervical spine show multilevel degenerative disc disease changes from C3 through C7; multilevel herniated disc configuration from C2 through C6 which "are extremely atypical for this patient's stated chronological age'" and mild spinal stenosis at C4-C5 and C5-C6 and moderate stenosis at C6-C7 (Tr. 320–22).

There are hundreds of pages of records in the transcript pertaining to Ewing's back and neck.   Most of that information is not particularly relevant to the Court's analysis, and therefore, a very brief summary will suffice.   On January 5, 2011, Momodou Sallah, a physician's assistant ("P.A.") at the Marion VA, performed a compensation and pension exam ("C&P exam") to evaluate Ewing's back and neck injuries for the purpose of determining veteran's disability benefits (Tr. 312–22).   He was diagnosed with degenerative disc disease of the lumbar spine with bilateral lumbar radiculopathy and degenerative disc disease of the cervical spine.   Following the C&P exam, the Department of Veterans Affairs rated Ewing's cervical spine impairment as 10% disabling and his lumbar spine as 10% disabling (Tr. 157–65).

Ewing has sought emergency care six times in approximately three years for back and/or neck pain.   He has seen a number of doctors including a physiatrist, a pain management specialist, an orthopedic surgeon, a neurosurgeon, and a rheumatologist. While Ewing's MRI scans are not completely normal, no doctor has been able to find a correlation between the imaging findings, the findings on physical examination, and his symptoms.

### 2.  Traumatic Brain Injury & Headaches

Ewing suffered several blows to the head while in the Army (*See* Tr. 596).   The

most significant was the aforementioned incident in April 2007 when he fell from the top of a helicopter.   He lost consciousness and has complained about persistent symptoms since that fall, including vertigo, tinnitus, headaches, and some memory loss.

Ewing was evaluated for traumatic brain injury in September 2009 at the Marion VA (*See* Tr. 597) (showing results from Neurobehavioral Symptom Inventory).   After he switched his care to the Hines VA, he was evaluated again on June 30, 2010 by Dr. Melanie Querubin (Tr. 596–601).   Dr. Querubin administered the Neurobehavioral Symptom Inventory to measure Ewing's TBI symptoms.   Ewing had mild headaches, meaning they were occasionally present and no medication was needed; he reported that bright lights triggered his headaches.   Ewing also complained about cognitive impairments for the first time, but indicated that they were not interfering with his work.   In particular, he indicated that he suffered from poor concentration which he rated as mild; he explained that he "find[s] himself driving past his exit."   He also indicated that he suffered from forgetfulness which he rated as moderate; he explained that he "forgets day-to-day things."   He also stated that he had difficulty making decisions, getting organized, and finishing things, and he rated those symptoms as moderate.   Ewing indicated that he was not suffering from any mental health symptoms at that time.   He also complained of insomnia, which had significantly worsened since his evaluation at the Marion VA.   Finally, Ewing indicated that the chronic back pain affects him the most.   Dr. Querubin noted that Ewing's back exam was unremarkable.

On January 5, 2011, Momodou Sallah, a physician's assistant ("P.A.") at the Marion VA, performed a compensation and pension exam ("C&P exam") to evaluate Ewing's TBI for the purpose of determining veteran's disability benefits (Tr. 298–312).   Ewing underwent a CT scan of his head as part of the C&P exam (Tr. 310–11).   The CT scan showed a

congenital cavum septum pallucidum, but no significant intracranial lesions.

Ewing reported to P.A. Sallah that he had headaches one to two times a week that lasted for about two to three hours.   He rated the pain from the headaches as an eight out of ten and said that he was unable to function when he had a headache.   He had vertigo symptoms with tinnitus five to six times per week.   He suffered from sleep disturbances and occasional fatigue.   He also suffered from memory problems which he thought were getting worse; he considered his memory impairment moderate.   He also reported cognitive problems, such as decreased attention, difficulty concentrating, and difficultly with executive functions.   When asked about psychiatric symptoms, Ewing stated that he had mood swings, anxiety, and depression.   When asked about neurobehavioral symptoms, he stated that he had irritability and restlessness.

Based on Ewing's reports and the testing, P.A. Sallah assessed Ewing's cognitive impairment and other residuals of the TBI as follows: (1) mild loss of memory, concentration, or executive functions, with no objective evidence on testing; (2) occasionally inappropriate social interaction; (3) three or more subjective symptoms that mildly interfered with his work, such as intermittent dizziness, daily mild to moderate headaches, tinnitus, frequent insomnia, or hypersensitivity to sound or light; (4) one or more neurobehavioral effects that occasionally interfered with workplace or social interaction but did not preclude them, such as irritability, lack of motivation, apathy, lack of empathy, moodiness, lack of cooperation, or inflexibility.   Ewing was diagnosed with chronic headaches and mild-moderate memory loss.

Following the C&P exam, the Department of Veterans Affairs rated Ewing's tinnitus as 10% disabling, his vertigo as 10% disabling, and the cognitive impairments and other residual effects of the TBI as 10% disabling (Tr. 157–65).

In March 2012, Ewing sought emergency care for a headache with visual floaters (Tr. 515–22).   He rated his pain as a 10 out of 10 and said he felt like his "head [was] going to explode."   He also said his vision gets foggy when he has a headache and "he looked at a street light and it looked like the whole side of the road was on fire."   He was intraveneously given Toradol, Reglan, Benedryl, and Ativan.   Ewing reported he felt sleepy but had no pain, and he was discharged.

### 3.  Post-Traumatic Stress Disorder, Depression, and Anxiety

Ewing had no psychiatric symptoms or treatment before his military service (*See*, *e.g.*, Tr. 625).   Between his discharge from the Army in 2009 and April 2010, Ewing received several mental health diagnoses, including anxiety disorder, neurosis, and post-traumatic stress disorder; he was treated with medication and behavioral therapy (*See* Tr. 281, 287–89, 295, 572, 600, 605).   There are no medical records from this time period.

Between April 2010 and October 2010, Ewing sought mental health treatment on at least two occasions at the Mental Health Clinic at the Hines VA (Tr. 569–78, 622–26).   In August 2010, he reported that he "seems more depressed."   He also complained of difficulty sleeping and subsequent low energy, difficulty concentrating, irritability, and loss of interest and pleasure.   He said that the constant pain affects numerous aspects of his quality of life.[3]   He was prescribed Citalopram.   In September 2010, he reported that he had not started taking the Citalopram because he was worried about being able to work. The doctor educated Ewing on Citalopram, continued his prescription, and indicated that he should be considered for individual psychotherapy.

---

[3] The record states "Effects of primary pain on quality of life: Anxiety, Appetite, Concentration, Depression, Energy level, Enjoyment of life, Household chores, Mobility, Mood, Physical activity, Relationship with others, Sleep, Social activities, Work" (Tr. 574).

In October 2010, Ewing relocated back to southern Illinois and re-established care at the Marion VA.   His first mental health visit was on January 26, 2011 with Dr. Nova Griffith.   Dr. Griffith performed a compensation and pension examination to evaluate Ewing's post-traumatic stress disorder for the purpose of determining veteran's disability benefits (Tr. 290–98).   She noted that Ewing had prior diagnoses for generalized anxiety disorder and neurosis; however, she felt Ewing was initially misdiagnosed and his original diagnosis should have been PTSD.

Dr. Griffith found that Ewing's remote, recent, and immediate memory were "moderately impaired."   Dr. Griffith noted that Ewing was overall a poor historian, very slow to answer questions, and appeared to have trouble coming up with answers to nearly all of the questions asked.   Ewing had difficulty falling and staying asleep, irritability or outbursts of anger, difficulty concentrating, hypervigilance, and an exaggerated startle response.   Dr. Griffith also found that Ewing had "markedly diminished interest or participation in significant activities, feeling [sic] of detachment or estrangement from others, and restricted range of affect."   She said he "lives a very isolated life"—he works alone on his job, has lost all of the friendships he had before going to Iraq and Afghanistan, and rarely leaves home except to go to work.   Dr. Griffith opined that Ewing's PTSD causes problems related to occupational functioning; specifically, Ewing has "poor social interaction."

Following the C&P exam, the Department of Veterans Affairs increased the rating for Ewing's PTSD from 30% disabling to 50% disabling (Tr. 157–65).

Throughout 2011, Ewing made a number of visits to the specialty behavioral health clinic at the VA (Tr. 323–26, 328–34).   The results of mental status exams varied, particularly the results concerning his memory and concentration, and his mood and

affect.   He was assessed a GAF score of 50 on four occasions (Tr. 332, 485).   By November 2011, Dr. Victoria Codispoti noted that Ewing did not report many problems except for pain and he did not present any psychiatric symptoms.   He was given a GAF score of 60.   Dr. Codispoti felt that he was stable on the amitriptyline, and she discharged him from the specialty behavioral health clinic back to primary care (Tr. 481–86).

However, Ewing was referred back to the specialty clinic three months later in January 2012 due to heightened signs and symptoms of PTSD and depression (Tr. 468–75).   The following month, it was determined that Ewing needed moderate, long-term therapy for PTSD, TBI, depression, and anxiety (Tr. 524–32).   During the first four months of 2012, Ewing was assessed a GAF score of 50 on four occasions (Tr. 469, 509, 531, 562).

**D.**      **Determination of the Department of Veterans Affairs**

In June 2009, Ewing was medically retired from the Army due to his permanent disability (Tr. 166).   The Army further concluded that his disability was service connected and he was entitled to 40% disability (Tr. 166, 491–93).

On February 11, 2011, following the three C&P exams detailed in the previous section, the Department of Veterans Affairs issued a decision amending Ewing's disability rating (Tr. 157–65).   Ewing's post-traumatic stress disorder was increased from 30% disabling to 50% disabling, effective December 3, 2009.   Ewing's cervical spine impairment was increased from 0% disabling to 10% disabling, effective December 3, 2009.   Ewing's lumbar spine impairment remained 10% disabling.   Ewing's tinnitus and vertigo, which are related to his traumatic brain injury, were evaluated separately from the brain injury itself.   Ewing's recurrent tinnitus was found to be 10% disabling, which is the highest evaluation awarded for that condition.   Ewing's vertigo was found to be 10%

disabling.   The cognitive impairments and other residual effects of the traumatic brain injury remained 10% disabling.   Ewing's total combined degree of disability is 70%.[4]

### E.        Consultative Examinations & State Agency RFC Assessments

Dr. Adrian Feinerman conducted a physical examination of Ewing in September 2011 at the request of the State of Illinois in connection with Ewing's application for disability benefits (Tr. 415–23).   The examination lasted 23 minutes.   Upon physical examination, Dr. Feinerman noted that Ewing was able to sit, stand, walk, hear, and speak normally.   He was able to lift, carry, and handle objects without difficulty.   His range of motion was within normal limits.

In October 2011, a state agency physician, C.A. Gotway, assessed Ewing's physical RFC (Tr. 448–55).   Dr. Gotway concluded that Ewing had the residual functional capacity to perform work at the medium exertional level.   There were no additional postural, manipulative, visual, communicative, or environmental limitations.

Dr. Harry Deppe conducted a psychological examination of Ewing in September 2011 at the request of the State of Illinois in connection with his application for benefits (Tr. 425–29).   The examination lasted 45 minutes.   Dr. Deppe indicated that Ewing had no difficulty staying on task for the evaluation and his responses were coherent and relevant.   Ewing's remote memory was good—he was able to recall his own social security number, his mother's maiden name, and the names of five presidents.   Ewing's intermediate memory was also good—he was able to recall seven digits forward and four digits in reverse.   Dr. Deppe rated Ewing's ability to relate to others, including fellow workers and supervisors, as fair to good.   Ewing's ability to understand and follow simple

---

[4] While the decision does not indicate his combined rating, it appears elsewhere in the records (Tr. 804–05), and it can be determined using the Combined Ratings Table at 38 C.F.R. § 4.25.

directions was intact.   His ability to maintain attention required to perform simple, repetitive tasks was also intact.   His ability to withstand stress and pressures associated with a day-to-day work activity was rated as fair to good.   Dr. Deppe rated Ewing's overall prognosis as "fair to good."

In October 2011, a state agency psychologist, M.W. DiFonso, assessed Ewing's mental RFC (Tr. 444–47).   With respect to understanding and memory, Dr. DiFonso found that Ewing was moderately limited in his ability to understand and remember detailed instructions.   As for sustained concentration and persistence, Dr. DiFonso found that Ewing was moderately limited in his ability to carry out detailed instructions and his ability to maintain attention and concentration for extended periods of time.   With respect to social interaction, Dr. DiFonso found that Ewing was moderately limited in his ability to interact appropriately with the general public and his ability to accept instructions and respond appropriately to criticism from supervisors.   Dr. DiFonso translated his findings into a specific RFC assessment—that Ewing's "cognitive and attentional skills are intact and adequate for simple one-two step as well as semi skilled [sic] work tasks."   He further concluded that Ewing's "interpersonal skills are moderately limited" while his "adaptive skills are within normal limits."

### F.   Evidence Not Before the ALJ

The transcript contains approximately 100 pages of medical records that were not part of the record at the time the ALJ issued his decision (*See* Tr. 42–46).   Specifically, there are additional records from the orthopedic surgeon from December 2011 to February 2012; there is a mental RFC assessment from Dr. John Lorenz, a psychiatrist whom Ewing began seeing in October 2012; and there are additional records from the VA from July 2012 to October 2012.   These records appear in the transcript at pages 719–814 and were

designated by the Appeals Council as Exhibits 18F, 19F, and 20F.   These records were submitted to the Appeals Council, which considered them in connection with Ewing's request to review the ALJ's unfavorable decision (Tr. 4).   Because the Appeals Council eventually refused Ewing's request, it is not appropriate for the Court to consider evidence that was not before the ALJ.   "Although technically a part of the administrative record, the additional evidence submitted to the Appeals Counsel cannot now be used as a basis for a finding of reversible error."   *Rice v. Barnhart*, 384 F.3d 363, 366, n.2 (7th Cir. 2004); *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).

### G.   Vocational Expert's Testimony

Following Ewing's testimony at the evidentiary hearing on July 31, 2012, a vocational expert (VE) testified.   The ALJ asked the VE a series of hypothetical questions. The first question required the VE to assume a person who was able to do work at the light exertional level, with the following limitations:

- Moderate difficulty maintaining social functioning;
- May have frequent contact with coworkers and supervisors, but no interaction with the general public;
- Should work in a task or object oriented setting as opposed to a service oriented setting;
- Moderate difficulty maintaining sustained concentration, but can understand, remember, and carry out routine instructions that require the exercise of little independent judgment or decision making.

(Tr. 80–81).   The VE testified that this hypothetical person could not perform any of his past jobs, but there are unskilled occupations that exist in significant numbers in the local area that the person could perform, such as bench worker or assembler, packager, or inventory checker.

For the second hypothetical question, the ALJ asked the VE to assume the same hypothetical person with a variety of additional, non-exertional limitations, including:

- Should work in a setting that has a moderate noise intensity level or quieter;
- Should avoid concentrated exposure to vibration;
- Could occasionally balance; and
- Should avoid concentrated exposure to hazards, such as moving machinery, unprotected heights, or operating commercial motor vehicle equipment

(Tr. 81–82). The VE testified that this hypothetical person would be precluded from working as a bench assembler and as a packager, but could still work as an inventory check, as a cleaner, or a marker/labeler.

For the third hypothetical question, the ALJ asked the VE to assume the hypothetical person had all of the limitations enumerated in questions one and two and also:

- Must be able to sit or stand at the workstation as frequently as every 20 minutes;
- Has "more of a marked" difficulty maintaining sustained concentration, persistence, or pace and would be off-task up to 10% of the workday consistently and would require supervisory intervention to get back on task

(Tr. 82–83). The VE testified that if the hypothetical person had either one of these additional limitations then he would be precluded from work at the light, unskilled level as well as the sedentary, unskilled level.

## THE DECISION OF THE ALJ

ALJ Janney followed the five-step analytical framework outlined in 20 C.F.R. § 404.1520 (*See* Tr. 24–41). At step one, the ALJ determined that Ewing had not engaged in substantial gainful activity since July 18, 2011, the alleged onset date. The ALJ also found that Ewing is insured for DIB through December 31, 2016. At step two, the ALJ found that Ewing had the severe impairments of disorders of the spine, tinnitus, vertigo, headaches, status post-traumatic brain injury, depression, and post-traumatic stress

disorder.   At step three, the ALJ determined that Ewing's impairments did not meet or equal a listed impairment.

The ALJ then determined that Ewing had the residual functional capacity to perform work at the light exertional level, with some limitations.   At steps four and five, based on the testimony of a vocational expert, the ALJ concluded that Ewing could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economy.   As a result, Ewing was not disabled.

## ANALYSIS

All of the issues raised by Ewing relate to the ALJ's assessment of his mental and physical residual functional capacity.   A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations."   20 C.F.R. § 404.1545(a)(1).   In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule.   Social Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("S.S.R. 96-8P"); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).   In assessing a claimant's RFC, the ALJ must consider *all* of the evidence in the record, and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment.   S.S.R. 96-8, at *5, 7.

Within each of the broad issues raised by Ewing, he makes a number of sub-arguments based on a variety of errors allegedly made by the ALJ.   After carefully reviewing each of Ewing's arguments and the Commissioner's responses, the Court has decided in the interest of judicial economy to address only the most clear-cut errors. Together these errors serve to undermine the ALJ's determination that Ewing was not disabled and necessitate remand.

### A.    Social Functioning

One of Ewing's strongest arguments is that the ALJ failed to adequately analyze his limitations in social functioning.   Social functioning refers to an individual's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.   20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00C2.   In a work situation, social functioning "may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers."   *Id.*   "Even a moderate limitation on responding appropriately to supervisors [or coworkers] may undermine seriously a claimant's ability to work."   *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010) (citing 28 C.F.R. § 404.1545(c)).

Here, at step three of his analysis, the ALJ found that Ewing had moderate difficulties in social functioning (Tr. 29).   In determining Ewing's RFC, the ALJ concluded that Ewing "should work in a setting where interaction is not the primary focus of job duties" (Tr. 37).   Accordingly, the ALJ restricted Ewing from working with the general public, but determined that he could have frequent contact with supervisors and coworkers (Tr. 31, 37).   Ewing argues that the ALJ failed to explain why his difficulties in social functioning adversely affected only his ability to interact with the general public, but not his ability to interact with coworkers and supervisors.   The Court agrees.

With respect to Ewing's ability to interact with supervisors, the ALJ mentioned Ewing's statement "that he gets along okay with authority figures" and Dr. Deppe's opinion that Ewing's ability to relate to others, including supervisors, was "fair to good" (Tr. 29, 38). On the other hand, the ALJ also mentioned Dr. DiFonso's opinion that Ewing was moderately limited in his "ability to accept instructions and respond appropriately to

criticism from supervisors" (Tr. 36).   In the face of this conflicting evidence, it was incumbent upon the ALJ to expressly indicate which evidence he credited and which he rejected, and explain his reasons for doing so.   *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); S.S.R. 96-8P, at *7 (instructing that the RFC assessment must "[i]nclude a resolution of any inconsistencies in the evidence as a whole.")

Although not expressly indicated, it appears to the Court that the ALJ rejected Dr. DiFonso's opinion based on the fact that the ALJ did not include a limitation in dealing with supervisors in the hypothetical question that he posed to the VE, or incorporate a corresponding restriction in the RFC assessment.   If the ALJ had credited Dr. DiFonso's opinion that Ewing was moderately limited in responding appropriately to supervisors, then Ewing may have been rendered unemployable.   *See O'Connor-Spinner*, 627 F.3d at 621; 28 C.F.R. § 404.1545(c).   However, the ALJ provided absolutely no explanation as to why he did not credit Dr. DiFonso's finding or why it was outweighed by other evidence. *See O'Connor-Spinner*, 627 F.3d at 621 ("An ALJ must explain why he does not credit evidence that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence."); S.S.R. 96–8P, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")

The ALJ's failure to analyze this finding is particularly troublesome because it shows that the ALJ selectively credited only the portions of Dr. DiFonso's assessment that supported his ultimate conclusion and disregarded the portions that did not.[5]   *Campbell*

---

[5] The ALJ adopted three of Dr. DiFonso's four findings regarding Ewing's social limitations, including that Ewing was moderately limited in overall social functioning and dealing with the public, but not significantly limited in dealing with coworkers (*See* Tr. 29, 31, 445, 446).   The only finding that the ALJ rejected was that Ewing was moderately limited in dealing with supervisors (*See*

*v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability.") (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)); *Myles*, 582 F.3d at 678 ("It is not enough for the ALJ to address mere portions of a doctor's report . . . .") (internal citations omitted).

Turning next to the ALJ's conclusion that Ewing can have frequent contact with coworkers, the Court also finds this conclusion is unsustainable.   The ALJ mentioned Dr. Deppe's opinion that Ewing's ability to relate to fellow workers was "fair to good," and the Court's own review of the record shows that Dr. DiFonso had a similar opinion (Tr. 38, 428, 445).[6]   That being said, the ALJ never addressed evidence that contradicts his assessment that Ewing can have frequent contact with coworkers.   In particular, Ewing stated, and medical records reflect, that he left one job voluntarily and was fired from another because he had difficulty getting along with his coworkers (Tr. 68, 296).   Ewing also indicated that he felt it was best when he worked alone (Tr. 297).   Dr. Nova Griffith opined that Ewing had a problem with occupational functioning due to "poor social interaction" and P.A. Sallah indicated that Ewing's social interaction was "occasionally inappropriate" (Tr. 296, 307).   While the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to his findings.   *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (internal citations omitted).

The Commissioner defends the RFC assessment by pointing out that at step 3 of his analysis, the ALJ concluded that "the evidence indicates that claimant is able to interact

---

Tr. 31, 445).
[6] Dr. DiFonso opined that Ewing was not significantly limited in his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" (Tr. 445).

independently, appropriately, effectively, and on a sustained basis with other individuals" (Doc. 36, p. 6; Tr. 29).   However, the ALJ did not describe *how* the evidence supported that conclusion, and it is not readily apparent to the Court.   The ALJ recited evidence that Ewing avoids most family functions except for Christmas because he does not like to be around people; that his children and his fiancée provide him with enough of a social network to mitigate the risk of suicide; and that he currently has friends when there have been other times since he retired from the Army that he had none.   It seems that rational minds would have a difficult time finding this evidence supported the conclusion that Ewing is able to "interact independently, appropriately, effectively, and on a sustained basis with other individuals."   Simply put, the ALJ's conclusion about Ewing's social limitations comes across as illogical, and without an explanation, the Court certainly cannot trace the path of the ALJ's reasoning from the evidence to the conclusion.

The Commissioner also points to the ALJ's finding that Ewing's "ability to maintain social interaction was not entirely eroded" because he was still able to establish rapport with providers and able to shop in stores (Doc. 30, p. 6; Tr. 37).   Again, rational minds would find it difficult to navigate the jump between that finding and the RFC assessment. While it may be entirely true that Ewing's ability to function socially is not "entirely eroded," Ewing does not have to be completely incapable of interacting with anyone and everyone in order to be unemployable.   Second, the fact that Ewing established a treatment relationship with his doctors and went to the store on occasion does not logically translate into an ability to frequently interact with supervisors and coworkers for forty hours a week.

In sum, because the ALJ failed to analyze relevant evidence in the record or provide a sufficient  explanation  of why he excluded evidence that did not support his decision, the Court cannot uphold the  ALJ's  RFC assessment as it pertains to Ewing's ability to interact

with coworkers and supervisors.   On remand, the ALJ must indicate whether he credits or rejects the evidence that Ewing had difficulty dealing with supervisors and coworkers.   If the ALJ credits the evidence, he must account for it in an updated RFC and hypothetical to the VE.   If the ALJ rejects the evidence, he must give reasons for doing so.

**B.      Concentration, Persistence, or Pace**

Another of Ewing's strongest arguments is his claim that the ALJ failed to adequately analyze his limitations in concentration, persistence, and pace. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."   20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00 C 3.

At step three of his analysis, the ALJ concluded that Ewing had moderate difficulties in concentration, persistence, and pace (Tr. 30).   These difficulties were due to Ewing's "slow processing time," impaired memory, and impaired concentration (Tr. 32, 37).   In assessing the impact of these symptoms on Ewing's ability to work, the ALJ determined that Ewing's memory and concentration deficits were not as severe as he claimed (*See* Tr. 32, 33).   The ALJ accounted for Ewing's symptoms by limiting him to simple routine types of tasks that require little independent judgment or decision-making for two-hour work segments (Tr. 31).

Ewing first claims that the ALJ erred in determining that his memory impairment was not as severe as he claimed.   This was a credibility determination.   The ALJ must support a credibility determination with substantial evidence and must explain his determination in a way that allows a court to establish that it was reached in a rational manner and logically based on specific findings and evidence.   *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011).   On judicial review, "[a]n ALJ's credibility determination is

reviewed with deference" and will be reversed "only if it is so lacking in explanation or support that [it is] 'patently wrong.'" *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009) (internal quotations omitted); *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.")

Here, the ALJ gave three reasons for finding that Ewing's testimony regarding the severity of his memory problem was not credible.   The first reason the ALJ gave was that Ewing did not take any medication for his impaired memory.   To the extent Ewing's memory difficulties were caused by PTSD, he *was* taking medication and undergoing behavioral therapy to treat his PTSD.   There is no evidence that any doctor recommended any further treatment to specifically address his impaired memory.   Additionally, to the extent Ewing's memory impairment was caused by his traumatic brain injury, nothing in the record suggests the existence or availability of a medication that would help improve or stabilize memory loss related to such an injury.   Therefore, the ALJ's intimation that the absence of medication meant Ewing's condition was less serious is wholly unsupported by any medical authority in the record.   The ALJ impermissibly "played doctor" and reached his own independent medical determination regarding medication.   *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (reversing because ALJ drew his own inferences from medical record without evidentiary support).

The third reason the ALJ gave for the adverse credibility determination—that a CT scan of Ewing's head did not show any masses or lesions—is also unsustainable for the same reason.   There is nothing in the record that indicates a person with Ewing's alleged memory problems would be expected to have brain masses or lesions, and it seems particularly unlikely if the memory problems were due to PTSD.   There is also nothing in

Page 26 of 31

the record that indicates the absence of brain masses or lesions means that Ewing's memory problem was not serious.   Again, the ALJ drew his own inferences from the medical record without evidentiary support.

The second reason the ALJ gave was that Ewing did not report significant memory lapses to his doctors.   However, the ALJ accidentally overlooked or intentionally ignored at least two specific complaints that Ewing made to his doctors.   In particular, in January 2012, Ewing told Barbara Bridges that he was late for appointments and forgot to pick his daughter up from school (Tr. 531).   In February 2012, he told Deborah Alcorn that he forgets appointments and blames his fiancée for not telling him (Tr. 469).   Therefore, the second reason for the adverse credibility determination is contrary to the evidence and cannot be sustained.

In sum, none of the ALJ's reasons for his adverse credibility determination are sustainable, and therefore neither is the credibility determination.   Consequently, the Court cannot meaningfully review the RFC assessment that is based in part on the ALJ's flawed credibility determination.   On remand, the ALJ must reconsider the credibility determination in light of the evidence that is actually in the record.

That being said, even if the ALJ's credibility determination was sustainable, the RFC assessment is still fatally flawed because there is a complete lack of evidence and analysis supporting the determination that Ewing could stay focused for two hours at a time.   In fact, the ALJ included the two-hour restriction in the summary of the RFC assessment (Tr. 31), but never mentioned it again (*See* Tr. 24–41).

In an attempt to save the RFC assessment, the Commissioner argues that it is supported by the opinions of Dr. Deppe and Dr. DiFonso (Doc. 36, pp. 7–8).   It is true that both doctors opined that Ewing's attention span was adequate to complete simple tasks.

However, neither doctor indicated that he could stick with those tasks for two hours at a time (Tr. 428, 446).   *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity."); *Walters v. Astrue*, 444 F. App'x 913, 918 (7th Cir. 2011) (noting that an individual with an attention span that is "adequate to attend to a simple work routine" does not necessarily have "the ability to concentrate on that routine for very long"); 20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00 C 3 (explaining that an individual able to complete a variety of simple tasks may still have limitations in concentration, persistence, or pace because they need extra supervision or assistance, their work is below quality and accuracy standards, or they are unable to work without unreasonable rest periods, undue interruptions, or undue distractions).

The only thing in the ALJ's decision that could possibly be considered as evidence supporting the two-hour restriction is the ALJ's finding that "[d]uring the mental status examination on September 21, 2011, the claimant displayed no difficulty staying on task" (Tr. 30).   However, the ALJ failed to describe *how* Ewing's ability to answer Dr. Deppe's questions for 45 minutes during a structured, interactive psychological examination translates into an ability to maintain focus in a work setting for twice as long without any supervision or prompting to bring him back to task.   Simply put, there is no evidence or analysis the Court can see supporting the two-hour restriction.

Furthermore, the two-hour restriction does not sufficiently address the amount of lost work time Ewing could be expected to experience due to his moderate limitation in concentration, persistence, or pace.   In other words, even if Ewing could stay focused for a two-hour interval, he might still lose 10% of the workday taking rest breaks or becoming distracted between intervals.   The VE testified that f Ewing was off-task for as little as 10%

of the workday—or a total of 48 minutes—he would be unemployable (Tr. 82–83).   On remand, the ALJ should be sure to adequately address how Ewing's limitation in concentration, persistence, or pace translates into lost work time.

In conclusion, because the RFC assessment is based in part on the ALJ's flawed credibility determination and unsupported by evidence in the record, it cannot be sustained.

**C.     Headaches**

At step two of his analysis, the ALJ concluded that Ewing's headaches were a severe impairment (Tr. 25, 26).   In assessing the impact of Ewing's headaches on his ability to work, the ALJ determined that they were not as frequent or intense as Ewing claimed (*See* Tr. 34, 36).   The ALJ accommodated Ewing's headaches by restricting him to a work environment with a "moderate noise intensity level or quieter" and without concentrated exposure to vibration (Tr. 31, 32, 38).

Ewing argues that the ALJ improperly rejected his allegations regarding the frequency and intensity of his headaches.   This was another credibility determination. The only reason the ALJ gave for discrediting Ewing's claims was that "while [Ewing] reported headaches to his providers, he did not describe to them the frequency or intensity of pain alleged at the hearing" (Tr. 34).   This reason appears to be completely rational on its face, however, minimal inspection reveals that it is utterly meaningless.   The most glaring problem is that Ewing *never* testified about his headaches at the hearing.   The other problem is that the ALJ did not indicate which medical records he was referencing, and the Court is unaware of any records suggesting that Ewing reported headaches to his doctors that were infrequent and/or relatively mild.   For example, in January 2011, Ewing reported to a physician at the VA that he had one to two headaches a week, they lasted

about two to three hours, his pain was an 8 out of 10, and he was unable to function (Tr. 301, 304).   In March 2011, Ewing sought emergency care for a headache and reported that his headaches were increasing in frequency and severity, and impaired his vision (Tr. 517, 518).   Additionally, in September 2011, Ewing complained of "frequent headaches" to Dr. Feinerman (Tr. 417).

For these reasons, the Court cannot conclude that the ALJ's credibility determination is rational and logically based on specific findings and the evidence. Consequently, it is not clear that in assessing Ewing's RFC and posing hypothetical questions to the VE, the ALJ fully and accurately accounted for all of the limitations caused by his headaches and supported by medical evidence in the record.

## **CONCLUSION**

Because of the ALJ's errors in evaluating Ewing's credibility and assessing his residual functional capacity, this case must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ewing is disabled or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

The Commissioner's final decision denying Kenny Ewing's application for social security disability benefits and supplemental security income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of Plaintiff Kenny Ewing.

**IT IS SO ORDERED.**

**DATE:**   June 10, 2014

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**